UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>Sharon Few</u>

    v.                                Civil No. 1:06-cv-00427-JL
                                        Opinion No. 2009 DNH 027
<u>Liberty Mutual</u>
<u>Insurance Company et al.</u>

# **O R D E R**

In this action brought pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001- 1461 (2000 & Supp. 2005), <u>pro</u> <u>se</u> plaintiff Sharon Few seeks to reinstate benefits under a life insurance policy she claims were wrongfully terminated by defendants Liberty Mutual Life Insurance and Liberty Life Assurance Company of Boston (collectively "Liberty Life") and certain Liberty Life employees, namely, Jolene Knight-Ballou, Linda Stalk, and Wayne Evans.[1]  <u>See</u> 29 U.S.C. § 1132.  The

---

[1]Defendants Knight-Ballou, Stalk, and Evans were added as parties primarily as part of a RICO claim, <u>see</u> 18 U.S.C. § 1961- 1968 (2000 & Supp. 2005), that was later dismissed by the court. <u>See Few v. Liberty Mut. Ins. et. al.</u>, No. 06-cv-427-SM (D.N.H. October 11, 2007); <u>Few v. Liberty Mut. Ins. et. al.</u>, No. 06-cv- 427-SM slip. op. at 16-19 (D.N.H. May 16, 2007).  The court notes, without deciding, that had the plaintiff's ERISA claim survived summary judgment, it is unlikely that it could successfully be brought against Knight-Ballou, Stalk, or Evans. <u>See</u>, <u>e.g.</u>, <u>Livick v. The Gillette Co.</u>, 524 F.3d 24, 29 (1st Cir. 2008) (discussing contours of functional fiduciary status); <u>Beddall v. State Street Bank and Trust Co.</u>, 137 F.3d 12, 18 (1st Cir. 1998).

defendants have filed a "Motion for Summary Judgment on the Administrative Record,"[2] see generally, L.R. 9.4(c)(1996), contending that their actions with respect to the life insurance policy were valid.  This court has jurisdiction under 29 U.S.C. § 1132(e) (ERISA).  After due consideration of the record, and a hearing on the merits, the court grants the defendants' motion.

I.   **APPLICABLE LEGAL STANDARD**

In ERISA cases where a claimant seeks review of a denial of benefits, the role of summary judgment is limited.  Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005); see Bard v. Boston Shipping Ass'n, 471 F.3d 229, 235 (1st Cir. 2006); cf. Fed. R. Civ. P. 56.  The standard of review in an ERISA case differs from review in an ordinary civil case, where summary judgment serves as a procedural device designed to screen out cases that present no trial-worthy issues.  See Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002); Orndorf, 404 F.3d at 517.  Because the focus of the court's review in an ERISA case is the final administrative decision, "the district court sits more as an appellate tribunal than as a trial court."  Leahy, 315 F.3d at 18.  Therefore, "[i]n the ERISA context, summary judgment is

---

[2]The court notes that the plaintiff did not file a motion for judgment on the administrative record.  See  L.R. 9.4(c).

merely the vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."  <u>Bard</u>, 471 F.3d at 235 (quotations omitted).[3]

The Supreme Court, in <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989), set forth a series of principles to guide courts in ERISA benefits cases.  <u>See</u> <u>Metro. Life Ins. Co. v. Glenn</u>, 128 S.Ct. 2343, 2347-48 (2008).  "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a <u>de novo</u> standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  <u>Firestone Tire and Rubber, Inc.</u>, 489 U.S. at 115.  The defendants concede that their decision is properly reviewed by this court under a <u>de novo</u> standard of review.  <u>See</u> Def's Mot. for Summ. J. 6, n.3; <u>see generally</u>, <u>Firestone Tire and Rubber, Inc.</u>, 489 U.S. at 115 (applicability of <u>de novo</u> standard of review); <u>cf.</u> <u>Glenn</u>, 128 S.Ct. at 2348 (determining whether deferential standard of review applies).  Under the <u>de novo</u> standard, the court must determine,

---

[3]"[T]he use of summary judgment in this way is proper regardless of whether . . . review of the ERISA decision maker's decision is <u>de novo</u> or deferential."  <u>Orndorf</u>, 404 F.3d at 517.

after a full review of the administrative record, whether the administrative decision was correct.  See, e.g. Orndorf, 404 F.3d at 518.  Although the de novo standard allows the court to substitute its judgment for that of the plan administrator, the claimant still carries the burden of demonstrating that she is disabled within the terms of the plan.  See id. at 519; see generally, Terry v. Bayer Corp., 145 F.3d 28, 34 (1st Cir. 1998). In sum,

> de novo review generally consists of the court's independent weighing of the facts and opinions in [the] record to determine whether the claimant has met [her] burden of showing [she] is disabled within the meaning of the policy.  While the court does not ignore facts in the record, the court grants no deference to administrators' opinions or conclusions based on these facts.

Orndorf, 404 F.3d at 518 (citation omitted).

To the extent a court must interpret plan language, "[b]oth trust and contract principles apply . . . ."  Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 585 (1st Cir. 1993). "When interpreting the provisions of an ERISA benefit plan, we use federal substantive law including the common-sense canons of contract interpretation."  Id. (quotations omitted).  The terms of the plan, therefore, are enforced according to its plain and unambiguous meaning, and whether the plan term is ambiguous is a

4

question of law for the court.  <u>Balestracci v. NSTAR Elec. and
Gas Corp.</u>, 449 F.3d 224, 230 (1st Cir. 2006).

## II.  <u>BACKGROUND</u>

This court's review is limited to the administrative record,
<u>see</u>, <u>e.g.</u>, <u>Orndorf</u>, 404 F.3d at 517, 519, and because review is
<u>de novo</u>, this court's focus is directed to the record relevant to
the merits of Liberty Life's denial of benefits.  Few was
employed as a "retro-rater" at Liberty Mutual in the late 1980s
and was a participant in a group life insurance policy[4]
("policy") sponsored by company.  Defendant Liberty Life
Assurance Company was the insurer and claims administrator under
the policy.

The terms of the policy include a "waiver of premium"
benefit whereby the policy premiums will be waived during a

---

[4]At times the plaintiff has disputed whether the policy in
the record was the exact policy she was subject to and has
alleged that the defendants have forwarded different versions of
that policy to her.  In the course of its <u>de novo</u> review, the
court was careful to refer to the group life insurance policy
carrying the same policy number as that noted on paperwork
completed by the plaintiff when making her original claim under
the policy in 1992.

period of total disability on the part of the policyholder.  The relevant terms of the policy, as amended on July 1, 1980,[5] state:

> Waiver of Premium Benefit - If due proof (herein called 'initial proof') is furnished to the Company that an Employee, while insured under the policy and before his or her sixtieth birthday, shall have become totally disabled after June 30, 1980, and that such disability has existed continuously for at least six months, the Company will waive further payment of premium on the Employee's insurance.
>
> Continued waiver of premium shall be subject to (a) annual submission of due proof of the continued existence of total disability within three months preceding each anniversary of receipt of initial proof and (b) submission by the Employee to examination by a physician, as provided below.  Waiver of premium will terminate upon the earliest of (a) failure to submit the required proof of the continued existence of total disability, (b) failure to submit to examination by a physician, as provided below, and (c) cessation of total disability; . . . .
>
> The Company shall have the right to have a physician it designates examine the Employee whenever it may reasonably require.

In 1992, Few requested that Liberty Life waive payment of her life insurance premium.  She also submitted a proof of disability form, completed by Dr. Maria Gatacales in April 1992,

---

[5]Few, in various filings with this court, references an early version of the policy, which differs substantially from the 1980 amended version.  As discussed in detail in Part III-A _infra_, the court reviewed all the relevant plan documents and concludes that the applicable waiver of premium benefit provision is the amended version.  Cf. Giannone v. Met. Life Ins. Co., 311 F. Supp.2d 168, 176 (D. Mass. 2004) (the rule in an ERISA case is that courts will consider all relevant plan documents); citing Bond v. Cerner Corp., 309 F.3d 1064, 1067-68 (8th Cir. 2002).

indicating that Few had been totally disabled since 1990 due to a major depressive episode, mild adjustment disorder, and a "dysthymic disorder."[6]

Liberty Life approved Few's application for waiver of the premium benefit in June 1992.[7]  It continued to pay the waiver of premium benefit until July 2005, when Liberty Life terminated Few's policy.[8]  It appears that Liberty Life routinely paid the premium benefit through 2000[9], when Few requested a copy of her policy, and asserted that she was due $25,000 under its terms. In June 2000, Liberty Life informed Few that it was reviewing her waiver of premium claim and that she would be required to update her medical information.[10]  When Few contacted Liberty Life and asked if she could submit a social security disability approval letter as proof, Liberty Life informed her that it required more direct medical documentation of her disability.[11]  Few eventually submitted a proof of disability form, completed by Dr. Hugh

---

[6]Record at 649.

[7]Record at 101.

[8]Record at 425-30.

[9]Record at 825 - It is uncertain whether this happened in 1999 or 2000, but in an August 2001 letter, Few states that "last year" she made this request.

[10]Record at 1330.

[11]Record at 88.

Lurie, stating that she was totally disabled because of major recurring depression.[12]  Liberty Life approved her claim for a waiver of premium benefit in December 2000, but informed Few that she would be contacted "on an annual basis for updated medical documentation to support your continued disability."[13]

Liberty Life continued to pay the waiver of premium benefit through 2004.  During this time, however, Few became increasingly resistant to providing medical records to Liberty Life,[14] informing company representatives at various times that she believed that Liberty Life's requests were unreasonable, illegal, and constituted harassment.[15]  In August 2002, she completed Liberty Life's "Combined Questionnaire" form and attached a lengthy typed memorandum in which she stated that she had recently been diagnosed with multiple sclerosis and describing numerous physical impairments, including, but not limited to: severe physical pain when sitting, standing, lifting and walking, sensitivity to clothing, difficulty driving, back, neck, and shoulder pain, extreme fatigue, inability to concentrate,

---

[12]Record at 836.

[13]Record at 1328.

[14]Record at 822-23; 825-26.

[15]Id.

sensitivity to heat and sunlight, memory loss, depression, and
headaches.[16]  She continued to assert that Liberty Life was
making unreasonable demands for information and "I consider this
harassment and Liberty is jeopardizing my health."[17]  She also
provided attending physician forms completed by Dr. William
Sheremata, a neurologist, in July 2002 indicating that Few
suffered from multiple sclerosis, memory loss, and depression.[18]
His report indicated that she had a "Class 5" (severe limitation)
physical impairment and "Class 4" (marked limitations) mental
impairment.  Few, who apparently was present when the forms were
completed, noted on the section of the form requesting copies of
office notes, test results, and other medical records, that "I do
not authorize that this information be provided to anyone."[19]
She further refused to assent to the standard medical records
release form.[20]

In response, Liberty Life informed Few that it needed such
information to evaluate her disability claim and Dr. Sheremata's

---

[16]Record at 806-810.

[17]Record at 810.

[18]Record at 815-817.

[19]Record at 816.

[20]Record at 815.

diagnosis of multiple sclerosis.  It also noted that it required updated information regarding that diagnosis of depression that had been the basis of disability up to that time.[21]  Liberty Life also informed Few that if it did not receive the proper forms and underlying documentation from Dr. Sheremata, "your claim may be closed for failure to provide proof for your waiver of premium benefit."[22]

Liberty Life and Few continued to wrangle over forms and documentation through July 2004 when Liberty Life informed Few that it would continue to approve her benefit for that year even though it concluded that Few had failed to provide the company with sufficient medical information to support the multiple sclerosis diagnosis and continued disability.[23]  It informed Few that it would request medical updates on an annual basis beginning February 2005.

Liberty Life, on February 28, 2005, sent Few a number of new forms, including a medical records release form and medical questionnaire.  It informed Few that it had scheduled an

---

[21]Record at 726-728.

[22]Record at 727.

[23]Record at 672.  Specifically, Few had not forwarded Dr. Sheremata's medical records and provided only her social security approval letter.

10

independent medical exam for her, explaining that if she did not authorize release of her medical records, the scheduled examination would proceed only with the records on file at Liberty Life.[24]  Few did not provide any additional medical records, but did attend an independent medical examination with Dr. Jonathan Amy, a board certified neurologist, in April 2005. Dr. Amy issued a report[25] stating that although he could not rule out multiple sclerosis based on the limited medical information available to him, he found Few's symptoms "quite vague" and that they did not strongly support that diagnosis.  He noted that "[i]t would be essential, in order to evaluate this any further, to have access to her MRI scans and the results of any other previous neurological evaluations."[26]  He also opined that Few was able to "perform walking activities, sitting activities, and standing activities in an unrestricted fashion," and because her psychological status appeared normal, "there is [no] medical reason why Ms. Few would be unable to return to work."[27]  Dr. Amy also recommended that Few undergo a functional capacity

---

[24]Record t 586-87.

[25]Record 546-557.

[26]Record at 554.

[27]Record at 555.

examination ("FCE") to better evaluate her "ability to work, as well as any physical restrictions and/or limitations . . . ."[28]

A few weeks later, Liberty Life attempted to schedule for Few an independent psychiatric evaluation ("IPE") in order to evaluate her claim of depression.[29]  Few objected on the basis of her reading of the policy, which she understood to authorize only one doctor visit per year.[30]  By a letter dated June 7, 2005, Liberty Life directed Few to the policy provision set forth above, and again requested that she submit the proper medical forms and schedule an IPE.  In that letter, Liberty Life again notified Few that failure to update her medical information would result in cancellation of the waiver of premium benefit.[31]  Few replied to Liberty Life with two letters regarding her situation, dated June 14th and 15th.  In the earlier letter,[32] she refused to attend any more appointments made by Liberty Life or to authorize the release of any further medical records.  She also

---

[28]Record at 555.

[29]Record at 540.

[30]Record at 93.  The policy provision Few relied on was superceded by the 1980 amendment to the policy that was in effect when she was an employee of Liberty Mutual.  See infra Part III-A.

[31]Record at 406-407.

[32]Record at 1043-45.

stated that she was now consulting with a hematologist about a potential blood disorder,[33] and had developed diarrhea and arthritis.  She further alleged that Liberty Life was "inflicting undue emotional stress upon me, which is causing unnecessary relapses of my condition and adding some new symptoms, such as, heart palpitations, anxiety attacks, nightmares, and sleepless nights.[34]  In the latter letter,[35] she wrote that she believed that Liberty Life's demands for information were excessive and that she had sufficiently complied with the requirements of the policy.  She stated that "I will not at this time furnish any other documents to Liberty Mutual."[36]  Further, she reiterated her refusal to "see anymore doctors this year because it is my understanding that Liberty is limited to how many appointments they can force upon me, and their request is outside of all legal limits."[37]  Few refused to provide any further medical information to the company, even though she stated in her June

---

[33]Liberty Life claims that defendant Stalk, in a phone conversation with Few in June 2005, asked Few to provide records from the hematologist and other physicians Few claimed to be consulting at the time and Few refused.

[34]Record at 1045.

[35]Record at 497-500.

[36]Record at 499.

[37]Record at 500.

15th letter that she was currently under the care of "several doctors."[38]   Liberty Life responded by letter on June 20th that failure to update her medical information and attend additional medical examinations would result in loss of her benefit.[39]

    That June, Liberty Life also referred the file to Dr. Robert Millstein, an internist, for review.  Dr. Millstein's report essentially concluded that based on the limited record before him (summarized above) and the relative lack of current medical information, Few's claims of disability could not be established.[40]  For example, he summarized both Dr. Amy's and Dr. Sheremata's apparently conflicting assessments of Few's multiple sclerosis diagnosis and stated that because of limited medical information, Dr. Sheremata's diagnosis could not be confirmed because although the "available records describe a variety of symptoms, which are nonspecific but which could be symptoms associated with multiple sclerosis," the record did not contain even the most basic diagnostic data.[41]  He opined that the limited record did not support Few's claims of the presence of a

---

[38]Id.

[39]Record at 404-405.

[40]Record at 465.

[41]Record at 466-67.

14

disabling cognitive impairment, migraines, or hives.  He noted
that he was unable to evaluate Few's claims of disabling fatigue
and physical pain in the absence of records from her primary care
physician or neurologist.[42]  Finally, with respect to Few's claim
of disabling depression (the medical condition that served as the
basis for the initial finding of disability) Dr. Millstein
concluded that:

> Although assessment of impairment due to depression is
> outside my area of expertise, the available medical
> information does not include support for the claimant
> receiving current psychiatric care or the use of
> antidepressants.  Therefore, it would appear unlikely
> that depression would cause impairment which would
> preclude full-time work.[43]

Liberty Life subsequently informed Few that effective July
1, 2005, it was cancelling Few's waiver of premium benefit.  In
its letter, Liberty Life stated that although Few had provided
proof of disability in the past, "proof is required on an annual
basis."[44]  It noted her refusal to provide updated documentation
and attend further medical appointments.  It stated that "[b]ased
on the IME completed by Dr. Amy, a record review by a consulting
internist, and all other available records, we have determined

---

[42]Record at 465.

[43]Id.

[44]Record at 426.

that there is not sufficient medical documentation to support

your continued eligibility under the waiver of premium

provision."[45]   Liberty Life then summarized the findings of both

Dr. Amy and Dr. Millstein, and Few's refusal to attend follow-up

appointments or provide any medical records from her current

doctors.[46]   Liberty Life concluded that:

> the Policy requires annual submission of due proof of
> the continued existence of total disability and
> submission to examination by a physician whenever
> Liberty may reasonably require.  You have not submitted
> recent medical information, have refused to attend a
> further required examination, and have failed to return
> the required forms within the time provided.
> Therefore, due to the lack of medical documentation to
> support disability, we must deny your claim for the
> continued waiver of premium benefit effective July 1,
> 2005.  Should you provide us with documentation in
> support of your claim and agree to submit to a further
> medical examination, we would reconsider this
> determination.[47]

Few appealed Liberty Life's decision and submitted

additional documentation and an affidavit in support of her

appeal.[48]   Liberty Life submitted the additional information to

---

[45]Id.

[46]Record at 427.

[47]Record at 428.

[48]Record at 324-345.  The additional documentation included a
proof of disability benefits letter from the social security
administration dated August 2005, office notes and lab reports
from a hematology/oncology practice generated in 2005, and
various emergency room records and lab reports dated 1991-1993.

Dr. Millstein for review, and subsequently denied Few's appeal. After review of the new information provided by Few, Liberty Life concluded that:  "While we recognize that you continue to report impairment associated with fatigue, pain, depression, memory disturbance and multiple sclerosis, the totality of medical and vocational documentation reviewed does not substantiate that you are disabled from performing other occupations within your vocational capacity."[49]

Specifically, it relied on Dr. Millstein's conclusion in an October 2005 report that "[t]he additional information, which is very limited, does not support the claimant's report of total disability,"[50] and his conclusions from the June 2005 report.  In his October report, Millstein noted that the diagnosis of multiple sclerosis and resulting functional impairment still could not be assessed on the basis of the additional information proffered by Few and in the absence of any further records from Dr. Sheremata.  He noted that Few submitted evidence from 1991 of an allergic reaction, but that otherwise the "record does not support ongoing episodes of generalized allergic reactions."[51]

---

[49]Record at 442.

[50]record at 437.

[51]Record at 438.

17

With respect to the potential blood disorder, Dr. Millstein reviewed the data and office notes from Few's hematologist and noted that "although [Few's test results] can evolve into [a serious blood disorder] the record does not support impairment at present from this asymptomatic condition."[52]  Dr. Millstein also stated that the hematologist's notes revealed that a standard performance test used to assess a patient's functional capabilities categorized Few as fully ambulatory, ("performance status 1").  He stated that because Few had reported being fatigued, "she was categorized as having a performance status of 1 instead of 0 (asymptomatic)."  Dr. Millstein called into question Few's claim of total disability, noting that "[a] performance status of 2 equates to a symptomatic patient who is bedridden less than 50% of the day," thus implying that her hematologist concluded that she was not even partially bedridden.[53]

Liberty Life reviewed its denial of the waiver of premium benefit two additional times in January and February 2006 after Few filed a complaint with the New Hampshire Department of

---

[52]Record at 341 (copy of test result); 438-39.  Dr. Millstein also noted that records from 1993 did not reveal the presence of coronary artery disease at that time.

[53]Record at 439.

Insurance.[54]  Liberty Life agreed to review documents provided to
the insurance department.[55]  In both cases, Few provided little
in the way of additional documentation from her physicians,[56] and
Liberty Life refused to reconsider her appeal.[57]

Few, a resident of Virginia, eventually filed a thirteen
count complaint in the United States District Court for the
Eastern District of Virginia.  That Court determined that venue
was proper in this court, and the matter was transferred here.
The only remaining count now before the court is Count 2,
asserting a cause of action under ERISA for denial of benefits.
The defendants have filed a motion for summary judgment on Count
2, and for the reasons set forth below, that motion is granted.

III. **ANALYSIS**

Liberty Life contends that it is entitled to summary
judgment because Few failed to satisfy her burden of establishing
that she was entitled to the waiver of premium benefit.

_____

[54]Record at 229-236.

[55]Record at 168-69; 206-207.  The court notes that an initial
set of documents were submitted to Dr. Millstein for review.
Record at 208-211.

[56]Record at 168-244.

[57]Record at 206-211; 1643-44.

Specifically, it argues that termination of the benefit was appropriate because Few:  (1) refused to submit to reasonable requests for medical exams as required by the policy, and (2) failed to provide "due proof" of her total disability.

## A. **Physician exams**

The court first addresses Liberty Life's contention that it was justified in cancelling Few's benefit because she refused to submit to certain medical exams.  As a preliminary matter, the court must confront a dispute that lies at the heart of the tension between the parties.  Few and Liberty Life consistently disagreed over the applicable policy language regarding the insurer's right under the policy to request that the insured visit a physician.  Specifically, Few insisted, relying on what she believed was applicable policy language, that Liberty Life only had the right to request one doctor visit per year.  Few maintained that the policy stated that "[t]he Company shall have the right to have a physician it designates examine the Employee whenever it may reasonably require during [her] disability, but not more often than once a year after the Employee's insurance has been continued for two full years under this provision." Liberty Life, relying on the policy language set forth in Part II, supra, insisted that under the contract it could request an

20

exam when it reasonably required.  The court concludes, after
review of all plan documents, that Liberty Life's reading of the
policy was correct.  The policy provision relied upon by Few can
be found within the policy documents under the heading "Permanent
Total Disability Benefit."  That provision was specifically
superceded by a comprehensive amendment to the plan in 1980
entitled "Waiver of Premium Benefit."  That 1980 amendment is the
applicable policy provision in this case and was appropriately
relied upon by Liberty Life.

On the basis of the record before it, the court concludes
that Few failed to abide by the plain language of the terms of
the policy and termination of the benefit by Liberty Life was
appropriate.  It is well-settled that "[u]nder ERISA, unambiguous
language in a plan is enforced according to its terms."
Balestracci, 449 F.3d at 230; see, e.g., Hughes v. Boston Mutual
Life Ins. Co., 26 F.3d 264, 268 (1st Cir. 1994)("straightforward
language in an ERISA-regulated insurance policy should be given
its natural meaning")(quotations omitted).  The policy
unambiguously establishes that continued payment of the waiver of
premium benefit is contingent upon Few's submission to reasonable
requests by Liberty Life for an independent medical exam.[58]  In

---

[58]Although the issue of whether the rule of contra
proferentem--that ambiguous terms in an insurance contract should

this case, Few adamantly refused to attend more than one appointment per year, subjecting her to possible cancellation of the policy.

The terms of the policy, however, authorize Liberty Life only to require that policy holders submit to *reasonable* requests for additional medical exams.  In this case, the court concludes that Liberty Life's request that Few attend an independent psychological exam and functional capacity exam was not unreasonable given the limited and somewhat dated information it possessed in 2005.[59]

Specifically, Few was initially granted the benefit on the basis of a finding of disabling depression in 1992.  Although Few's subjective reporting and limited notations on Dr. Sheremata's attending physician form indicated continuing depression, Dr. Amy's and Dr. Millstein's reports called that

---

be strictly construed against an insurer--applies in the ERISA context is unclear, see Balestracci, 449 F.3d at 231 n.2, this dispute does not involve ambiguity of terms, but rather application of a clear amendment to the policy.  Thus, this court need not concern itself with whether contra proferentem applies. See id.

[59]The fact that the information available to Liberty Life was limited was a function of Few's refusal to provide even basic diagnostic data.  It strikes the court as unfair for a claimant to withhold supporting documentation and then complain that requests for medical exams to replace that information gap are unreasonable.

diagnosis into question as a continuing basis for disability. When Few refused to submit updated information regarding her depression, it was reasonable for Liberty Life to request an independent psychological exam because the medical records on that claim of disability were over a decade old.  Cf. Brigham v. Sun Life of Canada, 317 F.3d 72, 84 (1st Cir. 2003) (insurer's decision to require medical evidence beyond subjective conclusions and unelaborated doctor's notes is not arbitrary).

Further, it was reasonable to request a functional capacity examination given Few's new basis for disability, namely multiple sclerosis.  Dr. Sheremata's two-page attending physician form, certain social security documents,[60] and Few's own reports regarding multiple sclerosis suggested continued total disability.  In the absence of detailed medical records supporting this changed diagnosis, however, cf. id. (insurer justified in seeking some clinical explanation for changed diagnosis), it was reasonable for Liberty Life to seek additional supporting information, in the form of a functional capacity

---

[60]The court notes that it is well-settled that in ERISA cases, an insurer (and a court upon de novo review) is not bound to rely on findings of the Social Security Administration regrading disability.  See, e.g., Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co., 230 F.3d 415, 420 (1st Cir. 2000).

exam, about the disabling nature of Few's multiple sclerosis.
Cf. id.

The court concludes, therefore, that the policy entitled
Liberty Life to terminate Few's waiver of premium benefit.  Few's
benefit was conditioned on her agreement under the policy to
submit to reasonable requests for examinations.  The court finds
that Liberty Life's requests for the FCE and IPE in this instance
were reasonable.  Liberty Life was justified, therefore, under
the terms of the policy to terminate her benefits given Few's
complete refusal to cooperate.[61]


## B. **Proof of disability**

Liberty Life also contends that it is entitled to summary
judgment because Few failed to submit the required proof of
continued disability.  This court agrees.

It is well-settled that a claimant has the burden of
demonstrating disability within the terms of the plan.  See,
e.g., Terry, 145 F.3d at 34.  The plain language of the policy

---

[61]The court notes, without deciding, that its finding of
reasonableness may have been different if Few had not flatly
refused to provide any supporting information regarding MS from
Dr. Sheremata.  Cf. Brigham, 317 F.3d at 85 (claimants have
burden to substantiate new diagnosis); Giannone, 311 F. Supp.2d
at 177 (insurer's decision to terminate benefits based on failure
to respond to repeated requests to bring medical information up
to date deemed "perfectly understandable").

stated that continued entitlement to the benefit was contingent upon "annual submission of due proof of the continued existence of total disability . . ."  The court must thus inquire as to the meaning of "due proof" and whether Few has provided such proof within the meaning of the contract.  See, e.g., Orndorf, 404 F.3d at 519; Dickerson v. Prudential Life Ins. Corp. of America, 574 F. Supp.2d 239, 244 (D.Mass. 2008).  The term "due proof" is undefined, and thus courts look to its common meaning when interpreting the contract language.  See, e.g., Filiatrault v. Comverse Technology, Inc., 275 F.3d 131, 135 (1st Cir. 2001) ("straightforward language in an ERISA-regulated plan should be accorded its plain, ordinary, and natural meaning").  The term "due" in this context is commonly understood to mean "capable of satisfying a need, requirement, obligation, or duty:  adequate, sufficient."  See Webster's New International Dictionary 699 (1993).  Few, therefore, was required to submit sufficient proof to demonstrate her entitlement to benefits and to substantiate her continuing disability with updated medical information and

clinical information.[62]  See Brigham, 317 F.3d at 83-85

(paraplegic claimant required to substantiate entitlement).

As set forth above, the information in the record paints an

extremely contradictory picture of the extent of Few's

disability.[63]  Few's lengthy report of her physical limitations

and Dr. Sheremata's attending physician forms indicate that Few's

capacity to function is severely limited by multiple sclerosis,

---

[62]Of course, the court does not mean to imply that Few was
required to provide information showing beyond any doubt that she
was disabled; she was merely required to provide proof adequate
to establish her entitlement to benefits.  Cf. Giannone, 311 F.
Supp.2d at 177-79 (understandable for insurer to deny benefits
without updated information, however, insurer was not justified
after new information "overwhelmed" contrary data).

[63]The focus of the court's analysis at this juncture is the
relatively updated information available in 2005.  The policy
clearly envisions that the benefit will be provided if total
disability is ongoing.  Thus, to the extent that the record
contains medical evidence from the 1990's, the court finds that
information to be of less assistance to its analysis.

Few, moreover, relies heavily on a determination by the
Social Security Administration that she was due disability
benefits.  The court notes, however, that although determination
of disability for purposes of entitlement to social security
benefits may have some bearing on the issue of disability under
an ERISA plan, this court is not bound by that determination.
See Pari-Fasano, 230 F.3d at 419-20.  Accordingly, the court
notes that it has reviewed the form letter from the Social
Security Administration summarizing Few's entitlement to
benefits, but does not accord significant weight to it.  See,
e.g., Dickerson, 574 F. Supp.2d at 245.

memory loss and depression.[64]  Dr. Amy's report, however, calls

into question the multiple sclerosis diagnosis, and the extent of

Few's mental and physical impairments.[65]  Moreover, a relatively

recent report completed by Few's hematologist/oncologist

indicates that Few possessed only a "status 1" level of

impairment.  Further, there is no record that Few currently was

receiving any psychiatric care or being actively treated for

depression (the basis for the initial finding of disability).

Simply put, Few's resistance to turn over any updated medical

records, despite her claim to have been seeing multiple doctors,

leaves gaping evidentiary holes to support her subjective reports

of depression and severe physical limitations.

Although the court is convinced that Few suffers from

multiple and very real physical challenges, it cannot conclude

that Few has carried her burden, within the terms of the policy,

to substantiate her claim of total disability.  This court is

simply unable to conclude, given Few's reluctance to provide even

minimal clinical support for Dr. Sheremata's conclusions

---

[64]In particular,  Dr. Sheremata's conclusions that Few has a
"Class 5" physical impairment (severely limited) and a "Class 4"
mental impairment (markedly limited).

[65]The court notes that Dr. Millstein echoed many of Dr. Amy's
conclusions, although this is not unexpected given the relative
paucity of objective medical evidence in the record.

regarding her ongoing physical and emotional challenges, that she provided due proof of total disability.  Cf. Brigham, 317 F.3d at 84 (noting that without information supporting unelaborated doctor's notes, a "reasonable factfinder" could determine paraplegic was not totally disabled).  It is true that the forms provided by Dr. Sheremata weigh in favor of disability, but without the supporting clinical information that led to that new diagnosis, it is difficult to overcome the contrary conclusions drawn by Dr. Amy, Dr. Millstein, and Few's own oncologist/hematologist suggesting something less than total disability. Although Dr. Sheremata was Few's treating physician, an insurer is not required to blindly accept conclusory findings provided by an insured's physician.  See Brigham, 317 F.3d at 84; cf. Cooper v. Life Ins. Co. of North America, 486 F.3d 157, 166-67 (6th Cir. 2007) (insurers, although not allowed to ignore treating physician's reports, are not obligated to blindly accept them either) relying on Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).[66]

---

[66]In fact, in the ERISA context, the Supreme Court has specifically rejected the "treating physician's rule," deciding that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician."  Black & Decker Disability Plan, 538 U.S. at 834; see, e.g., Bufonge v. Prudential Ins. Co. of America, 426 F.3d 20, 27 (1st Cir. 2005).

Thus, faced with conflicting and incomplete supporting documents from Few, this court is constrained to conclude, after a de novo review of the record, that Few has not met her burden under the policy.  Liberty Life, therefore, was justified in terminating her benefit and is entitled to summary judgment.[67]

**IV.   CONCLUSION**

After a de novo review of the administrative record before this court, the defendants' motion for summary judgement (document no. 108) is granted.  The clerk is directed to enter judgment for the defendants and to close the case.


        **SO ORDERED.**

                                      _____
                                      Joseph N. Laplante
                                      United States District Judge


Dated:  March 19, 2009

cc:  MS Few, pro se
     Guy P. Tully, Esq.
     Jeffrey Scott Brady, Esq.

--------

[67]The court notes, again, that it is not beyond peradventure that it would have reached a different conclusion:  (1) if more clinical information had been provided to Liberty Life by Few, (2) that information was part of the existing administrative record, and (3) it was capable of review by this court.